**BRAINTREE LABORATORIES, INC., Plaintiff,**

v.

**NEPHRO–TECH, INC. and G.P. Georges III, Defendants.**

**No. 96–2459–JWL.**

United States District Court, D. Kansas.

Jan. 7, 2000.

Craig T. Kenworthy, Swanson Midgley, LLC, Kansas City, MO, Arthur A. Smith, Jr., Boston, MA, Thomas D. Henteleff, Prescott M. Lassman, Kleinfeld, Kaplan and Becker, Washington, DC, for Plaintiff.

Mark E. Brown, Marcia J. Rodgers, Litman, Kraai & Brown, L.L.C., Kansas City, MO, Steven H. Mustoe, Eric C. Carter, Kurlbaum Stoll Seaman & Mustoe, P.C., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Braintree Laboratories, Inc., the assignee of United States Patent No. 4,870,105, (hereafter the " '105 patent") brought this patent infringement action against defendants Nephro–Tech, Inc. and G.P. Georges III, alleging that defendants' marketing and distribution of their calcium acetate product infringes the '105 patent. A jury trial in this matter was held before this court between September 28, 1999 and October 7, 1999. On October 7, 1999, the jury returned a verdict in favor of plaintiff, finding the '105 patent valid and infringed, and awarding damages in the amount of $300,000. Presently before the court are plaintiff's motion to alter or amend the judgment (doc. 147) and defendants' motion for judgment as a matter of law, or in the alternative, for new trial (doc. 145). For the reasons set forth below, plaintiff's motion is granted in part and denied in part, and defendant's motion is denied.

## I. Background

Plaintiff Braintree Laboratories, Inc. ("Braintree"), a Massachusetts corporation, is the assignee of the patent in suit, which was issued by the United States Patent and Trademark Office ("PTO") in favor of John S. Fordtran on September 26, 1989. Plaintiff markets a drug under the brand name Phos–Lo, which implements plaintiff's patented use of calcium acetate to treat kidney dialysis patients.

The calcium in plaintiff's drug binds with excess phosphorus in the lower gastrointestinal tract to form an insoluble salt, thereby facilitating the excretion of phosphorous contained in food. Because diseased kidneys are unable to effectively eliminate phosphorus, a task normally accomplished by healthy kidneys, plaintiff's drug is useful to end-stage renal disease ("ESRD") patients.

Defendants market a calcium acetate product under the brand name Calphron. According to defendants, their product is marketed and sold as a calcium supplement, and as such, does not infringe plaintiff's method-of-use patent. Defendants further contend that plaintiff's patent is invalid for obviousness or anticipation, and that it is unenforceable because plaintiff engaged in inequitable conduct before the PTO during the reexamination proceedings.

On July 23, 1999, defendants' motion for summary judgment on the issue of patent validity was denied by the court. The case then proceeded to a trial on the merits. On October 7, 1999, following a trial by jury, the jury returned a verdict in favor of plaintiff, finding the '105 patent valid and infringed. The parties filed post-trial motions.

## II. Legal Standards

It is well-settled that, as a general rule, "in deciding procedural questions that involve no special issues relating to patent law," the Federal Circuit applies the law of the regional circuit in which the trial court sits. *Sun–Tek Indus. v. Kennedy Sky Lites, Inc.*, 856 F.2d 173, 175 (Fed.Cir. 1988). Accordingly, the court analyzes the parties' post-trial motions involving procedural matters not unique to the area of

patent law in light of Tenth Circuit law. *Payless Shoesource, Inc. v. Reebok Int'l, Ltd.*, 998 F.2d 985, 987 (Fed.Cir.1993).

### A. Post–Verdict Motion for Judgment as a Matter of Law[1]

 A motion for judgment notwithstanding the verdict ("judgment n.o.v.") under Fed.R.Civ.P. 50 "may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." *Jackson v. City of Albuquerque*, 890 F.2d 225, 230 (10th Cir.1989). Judgment as a matter of law is appropriate "only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." *J.I. Case Credit Corp. v. Crites*, 851 F.2d 309, 311 (10th Cir.1988). "Judgment n.o.v. should be cautiously and sparingly granted." *Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir.1988). "In determining whether the grant of a motion for judgment n.o.v. is appropriate, the court must view the evidence and indulge all inferences in favor of the party opposing the motion and cannot weigh the evidence, consider the credibility of witnesses or substitute its judgment for that of the jury." *Id.* (internal citations omitted).

### B. Motion for New Trial

 Motions for a new trial are committed to the sound discretion of the trial court. *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir.1993); *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). They are "not regarded with favor and should only be granted with great caution." *United States v. Kelley*, 929 F.2d 582, 586 (10th

---

1. The court notes that Fed.R.Civ.P. 50 was amended in 1991, and now allows parties to move for "judgment as a matter of law" before the case is submitted to the jury, *see* Fed.R.Civ.P. 50(a), and for a "renewed judgment as a matter of law" within 10 days of the entry of judgment, *see* Fed.R.Civ.P. 50(b). Although the "judgment as a matter of law"

or "JMOL" terminology replaces the earlier designations of "directed verdict" and "judgment notwithstanding the verdict," the legal standards governing the analysis of such motions remain unchanged. *See Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir.1996); 1991 advisory committee notes to Fed.R.Civ.P. 50.

Cir.1991). Where a jury's verdict is challenged as contrary to the evidence, the court's "inquiry focuses on whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." *Black v. Hieb's Enters., Inc.*, 805 F.2d 360, 363 (10th Cir.1986).

## III. Discussion

### A. Defendants' Post–Trial Motion

In their post-trial motion, defendants move for judgment as a matter of law with respect to the issues of infringement, validity, G.P. Georges III's individual liability, and damages. Additionally, defendants request the court declare the '105 patent unenforceable on the ground that plaintiff engaged in inequitable conduct before the PTO. Alternatively, defendants move the court to order a new trial in this case. As detailed below, the court denies defendants' motion in its entirety.

### 1. Motion for JMOL

In their papers, defendants move for judgment as a matter of law on the issues of damages, patent infringement, patent validity, and G.P. Georges III's individual liability on the ground that there exists no substantial evidence to support the jury's verdict with respect to these issues. In response, plaintiff argues that defendants are precluded from seeking judgment as a matter of law on any of the above matters for failure to move for judgment as a matter of law at the close of all the evidence and before the case was submitted to the jury. The court agrees.

 Rule 50(b) of the Federal Rules of Civil Procedure provides, in pertinent part:

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judg-

ment as a matter of law by filing a motion no later than 10 days after entry of judgment. . . .

Fed.R.Civ.P. 50(b). As interpreted by the Tenth Circuit, Rule 50 precludes a party "from relying upon grounds in a motion for judgment notwithstanding the verdict that were not previously raised in support of the motion for a directed verdict." *First Security Bank of Beaver, Oklahoma v. Taylor*, 964 F.2d 1053, 1057 (10th Cir. 1992). Furthermore, "[a]s a general rule, a defendant's motion for directed verdict made at the close of the plaintiff's evidence is deemed waived if not renewed at the close of all the evidence; failure to renew that motion bars consideration of a later motion for judgment n.o.v." *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1455 (10th Cir.1987).

A limited exception to the general rule precluding consideration of a post-trial motion for JMOL due to the movant's failure to move for a directed verdict at the close of all of the evidence has been recognized by the Tenth Circuit. *Id.* at 1456. That exception may be invoked where:

(1) the defendant moved for directed verdict at the close of the plaintiff's evidence; (2) the trial court, in ruling on the motion, somehow indicated that renewal of the motion would not be necessary in order to preserve the issues raised; and (3) the evidence introduced after the motion was brief.

*Id.*

 As correctly noted by defendants, the Tenth Circuit does not require unflagging adherence to the language of Fed. R.Civ.P. 50, and has stated that such motions are to be construed liberally and "do not require technical precision as long as the trial court is aware of the movant's position." *Aguinaga v. United Food and Commercial Workers Int'l Union*, 993 F.2d 1463, 1470 (10th Cir.1993). The cases cited by defendants do not, however, support their view that such leniency toward technically imprecise Rule 50 motions may

somehow extend to excuse a party's complete failure to move for directed verdict at the close of all the evidence. Instead, the cases cited by defendants stand for the proposition that, where a party has moved for directed verdict, the rule of liberal construction vis-à-vis Rule 50 motions protects against a party's failure to identify with absolute specificity the precise grounds for its motion. *See, e.g., Anderson v. United Telephone Co. of Kansas*, 933 F.2d 1500, 1503–04 (10th Cir.1991) (defendant's motion for directed verdict on plaintiff's civil blacklisting claim sufficient under Rule 50 despite perceived lack of precise specificity as to the grounds on which defendant believed the evidence to be insufficient); *National Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir.1986) ("There is no question that Sharon moved for a directed verdict at the close of all the evidence; the issue is whether that motion encompassed damages for lost goodwill and reputation.")

■ The court further rejects defendants' argument that plaintiff's motion for JMOL at the close of all the evidence on the issues of validity and infringement somehow preserved defendants' motion for JMOL on the same issues. Indeed, contrary to defendants' assertion that they were not required to stand up and "ditto" plaintiff's motion for judgment as a matter of law at the close of all the evidence, and even if it appeared to defendants that any such motion would be summarily denied by the court, Rule 50 clearly mandated such a motion, and defendants' failure to so move bars the court's consideration of their post-trial motion for judgment as a matter of law on each of the issues raised therein. *See, e.g., W.S. Molnar Co. v. IKG Indus.*, 82 F.3d 434 (table), 1996 WL 128262 at * 1 (Fed.Cir.1996) ("Even if it was apparent that the JMOL motion would be denied, it was incumbent upon IKG to clearly establish in the record the grounds for any later motion.")

■ Finally, the court rejects defendants' contention that, because the arguments raised in their post-trial motion for JMOL were previously raised at the summary judgment stage, a motion for directed verdict was unnecessary at the close of all the evidence because the court was on notice that defendants believed they were entitled to judgment as a matter of law with respect to each of those issues. Indeed, the issue is not whether the court and the plaintiff were aware that, at some point in the litigation, defendant believed it was entitled to judgment as a matter of law, but instead whether the plaintiff and the court were on notice that defendant believed that the evidence was so insufficient that the case should not be allowed to go to the jury. In this case, although it was possible that defendants believed that the evidence presented at trial was of such a nature that they were entitled to judgment as a matter of law on each of the issues eventually decided against them by the jury, it was equally likely that defendants believed that the evidence presented material issues of fact unsuitable for disposition on a motion for directed verdict. Because either conclusion could be drawn from defendants' failure to move for judgment as a matter of law at the close of all the evidence, Rule 50's purpose, i.e., to allow the non-movant an opportunity to attempt to correct any evidentiary deficiencies before submission of the case to the jury, was not fulfilled in this case. *See, e.g., Peterson v. Hager*, 724 F.2d 851, 854 (10th Cir.1984). Furthermore, and as duly noted by plaintiff, "[f]ailure to renew a summary judgment argument—when denial was based on factual disputes—in a motion for judgment as a matter of law under Fed.R.Civ.P. 50(a)(1) at the close of all the evidence is considered a waiver of the issue on appeal." *Rich v. Med–Nat'l, Inc.*, 134 F.3d 383 (table), 1998 WL 39236, at *3 (10th Cir.1998) (citing *Allahar v. Zahora*, 59 F.3d 693, 695–96 (7th Cir. 1995)).[2] Accordingly, although defendants

**2.** The court notes that denials of a party's post-trial motion for JMOL for failure to so

raised some of the arguments currently before the court at the summary judgment stage, that fact alone does not excuse defendants' failure to move for JMOL at the close of all the evidence.

■ Although defendants moved for judgment as a matter of law on Mr. Georges' individual liability, the issue of infringement, and plaintiff's entitlement to damages at the close of plaintiff's case-in-chief, defendants did not renew their motion with respect to these issues at the close of all the evidence. As set forth above, a party's failure to renew a motion for JMOL on a particular issue bars the court's consideration of the issue on a post-trial motion for JMOL. *Karns,* 817 F.2d at 1455. The court further notes that defendants' motion with respect to these issues does not fall within the limited exception enunciated in *Karns* because, although the first element of the test is met with regard to these issues because defendants moved for judgment as a matter of law at the close of plaintiff's evidence, the remaining prongs of the *Karns* test were not satisfied in this case. More specifically, in ruling on defendants' motion with respect to Mr. Georges' individual liability, the issue of infringement, and plaintiff's entitlement to damages at the close of plaintiff's evidence, the court did not indicate an intent to reserve the motion for future consideration, and the evidence presented thereafter was not brief, but instead consisted of several days of trial testimony and included the admission of several evidentiary exhibits on defendants' behalf. Accordingly, the court denies defendants' motion for JMOL with respect to the issues of G.P. Georges III's individual liability, infringement, and damages as untimely under Fed.R.Civ.P. 50(b).

Unlike the other issues raised in defendants' post-trial motion for JMOL, which were, as detailed above, at least raised at the close of plaintiff's evidence, no motion for judgment as a matter of law with respect to the issue of validity was made at any time on defendants' behalf during trial. As set forth above, failure to move for a directed verdict at the close of all the evidence bars the court's consideration of a litigant's post-trial motion for JMOL. *Taylor,* 964 F.2d at 1057. Accordingly, defendants' motion for JMOL with respect to the issue of the '105 patent's validity need not be considered by the court, and is denied on this basis alone.

■ Although the court declines to consider the merits of defendants' post-trial motion for judgment as a matter of law, the court notes that it would not grant the requested relief in any event. Indeed, with respect to the issue of patent validity, defendants' arguments set forth in their post-trial motion amount to no more than a rehashing of the arguments previously raised, and rejected by the court, at the summary judgment stage. At that time, the court denied summary judgment in favor of defendants because, in its opinion, material issues of fact with respect to those matters remained for trial.

■ At the ensuing trial on the merits, defendants had the opportunity to present evidence to the jury to support their theories with respect to the issue of validity of the '105 patent. While there exists on the record evidence that would support defendants' theories that the '105 patent is invalid, plaintiff presented considerable evidence to support its competing contentions that the claims in issue are not rendered invalid for anticipation[3] or obviousness[4] in

move at the close of all the evidence have been affirmed by the Federal Circuit, and thus such denials are not unprecedented in patent cases. *See, e.g., Megadyne Medical Prods., Inc. v. Aspen Laboratories, Inc.,* 864 F.Supp. 1099 (D.Utah 1994) (applying Tenth Circuit law on the issue of JMOL motion), *aff'd without opinion,* 52 F.3d 344, 1995 WL 156494

(Fed.Cir.1995); *W.S. Molnar Co. v. IKG Indus.,* 82 F.3d 434 (table), 1996 WL 128262 at *1 (Fed.Cir.1996) (applying Sixth Circuit law on the issue of JMOL motion).

3. Pursuant to 35 U.S.C. § 102, a patent is invalid if it is anticipated by the prior art. 35 U.S.C. § 102. "A judgment of invalidity for

light of the prior art. Indeed, with respect to the issue of patent validity, experts for both parties testified as to their perceptions of the scope of the allegedly invalidating prior art references, and the jury was charged with the task of weighing the conflicting testimony and evidence presented at trial. Thus, although defendants presented evidence to support their theory that the '105 patent is invalid in light of the prior art, the court is simply not convinced that no reasonable juror, after being instructed on the elements of anticipation and obviousness, the standard of proof required, and after considering all of the evidence presented at trial could not have returned a verdict upholding the validity of the patent at issue in this case.

Similarly, the jury was instructed, without objection, with respect to the elements of infringement, and was therefore required to weigh the parties' conflicting evidence, and ultimately return a verdict, with regard to that issue. The court does not believe that the evidence in the trial record is such that no reasonable jury could have found that defendants' sale of Calphron infringed the '105 patent. Instead, although presented with evidence to support defendants' contention that its product was being sold for a substantial non-infringing use, i.e., as a calcium supplement, the jury undoubtedly chose to reject defendants' position by finding that plaintiff's method-of-use patent for calcium acetate was infringed by defendants. Indeed, that was a very reasonable conclusion to draw from the evidence as a whole.

To the extent that defendants assert that the jury's verdict on the issue of infringement somehow impermissibly invades the province of the Food and Drug Administration ("FDA") by necessitating the conclusion that defendants' drug is unsuitable for sale or use as a calcium supplement, a matter wholly within the FDA's jurisdiction, the court does not believe that such a conclusion is required, or even warranted, in light of the jury's verdict. Instead, and as has been reiterated by the court on several occasions during the course of this litigation, whether defendants' product is suitable for use as a calcium supplement was not at issue in this case, and neither side was permitted to speculate or present evidence with respect to their opposing views on the propriety of FDA approval of defendants' drug for sale as a calcium supplement. Rather, the issue before the jury was whether defendants' product was, without regard to whether the FDA guidelines permitted sale as a calcium supplement, actually being marketed and sold for phosphorus binding in end stage renal disease patients. The jury heard the parties' competing evidence on that score, and was, apparently, convinced by plaintiff's evidence and not by defendants' evidence. The court agrees that the evidence at trial permitted such a conclusion, particularly in light of such evidence as the testimony that defendants regularly attended trade shows directed toward health care providers in the nephrology field; that users of defendants' product were instructed to ingest the pills

anticipation requires that a single prior art reference disclose every limitation in a patent claim." *General Elec. Co. v. Nintendo Co., Ltd.,* 179 F.3d 1350, 1356 (Fed.Cir.1999). Whether a prior art reference anticipates a patent claim is a question of fact. *Hoover Group, Inc. v. Custom Metalcraft, Inc.,* 66 F.3d 299, 302 (Fed.Cir.1995).

**4.** A patent is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the

art to which said subject matter pertains." 35 U.S.C. § 103(a). The obviousness analysis requires the fact-finder to engage in four underlying factual inquiries, the so-called Graham factors: "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness." *Kegel Co., Inc. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1430 (Fed.Cir.1997); *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

at mealtimes (which, according to the testimony of plaintiff's experts, increased the likelihood of phosphate binding and negated the likelihood that any calcium supplementation would occur); that, on balance, calcium acetate is a less-than-optimal choice as a calcium supplement due to the high levels of the product that would need to be ingested to effect calcium supplementation; and the evidence of defendants' letter to a state agency comparing, if only in relation to cost, its Calphron product to plaintiff's Phos–Lo product. In addition, the very name of defendants' product is highly suggestive of the use of calcium acetate with renal patients by its combination of readily recognizable medical references to calcium and kidneys ("Cal" and "phron," respectively). That only slightly veiled suggestion of this use is made even more transparent by the fact that, as is the case with plaintiff's product, defendants' product is recommended to be swallowed, never chewed, at mealtimes, and by the additional fact that the number of milligrams of calcium acetate contained in each of defendants' tablets (667) is identical to the number of milligrams contained in each of plaintiff's tablets. Such evidence could easily support the jury's finding that, although suitable for the non-infringing use as a calcium supplement, defendants were nonetheless selling their product as a phosphate binder in violation of the '105 patent.

 Additionally, the court notes that, if it were to consider the merits of defendants' post-trial motion with respect to the jury's award of damages, it would decline to overturn the jury's verdict on that issue as well. To that end, the court points out that the jury was instructed, without opposition by either party, that, in the event that damages were found to have been sustained by plaintiff under the facts of this case, there existed two methods by which any such damages could be calculated. Both parties presented evidence to support their competing theories regarding the nature and extent of the damages to which plaintiff was entitled upon a finding of infringement in this case. Pursuant to the court's instructions, the jury was authorized to reject defendants' theory that damages, if any, should be limited to a reasonable royalty and to instead award damages based on a lost profits theory.

Furthermore, the court rejects defendants' argument that their evidence that Calphron was being sold by physicians specializing in areas other than nephrology or the treatment of kidney disease should control to deny plaintiff's claim for lost profits. The exhibit to which the defendants refer does not establish, conclusively or otherwise, why defendants' product was ordered by those physicians, or for what purpose it was being dispensed. In fact, evidence was presented which indicated that although cardiologists may not, as a general rule, treat kidney disease, a particular cardiologist may nonetheless treat a patient with heart problems who also suffers from ESRD and might therefore order Calphron for that patient to be used as a phosphate binder. Thus, and as was noted by the court in denying defendants' motion for directed verdict on the issue of damages on this basis at the close of plaintiff's case, although the exhibit certainly constitutes evidence that Calphron was sold to physicians outside the nephrology field and the inference could therefore be drawn that those physicians were utilizing Calphron for something other than phosphate binding, it would be equally appropriate for the jury to draw a contrary conclusion regarding the significance of the data set forth therein. Consequently, the court does not agree with defendants' assertion that it would be unreasonable for the jury to infer that some or all of the physicians listed in exhibit 455 purchased defendants' product for use as a phosphate binder. In short, the court does not believe that the jury's award is unreasonable in light of the evidence presented at trial, and thus, even if it were to consider the merits of defendants' JMOL motion on the issue of damages, finds no reason to upset the jury's award of damages.

The court also concludes that, if it were to consider defendants' post-verdict motion for JMOL with respect to the issue of Mr. Georges' personal liability, it too would be denied for the reason that the court believes that substantial evidence was presented at trial to support the jury's verdict with respect to that issue. In *Hoover v. Custom Metalcraft, Inc.*, 84 F.3d 1408 (Fed.Cir.1996), the Federal Circuit explained that

> In general, a corporate officer is personally liable for his tortious acts, just as any individual may be liable for a civil wrong. This general rule "does not depend on the same grounds as 'piercing the corporate veil,' that is, inadequate capitalization, use of the corporate form for fraudulent purposes, or failure to comply with the formalities of corporate organization." When personal wrongdoing is not supported by legitimate corporate activity, the courts have assigned personal liability for wrongful actions even when taken on behalf of the corporation. However, this liability has been qualified, in extensive jurisprudence, by the distinction between commercial torts committed in the course of the officer's employment, and negligent and other culpable wrongful acts.
>
> Thus, when a person in a control position causes the corporation to commit a civil wrong, imposition of personal liability requires consideration of the nature of the wrong, the culpability of the act, and whether the person acted in his/her personal interest or that of the corporation.

*Id.* at 1411 (internal citation omitted). In order to impose individual liability upon a corporate officer or director without first piercing the corporate veil, the *Hoover* court concluded, "the officer must act culpably in that the officer must actively and knowingly assist with the corporation's infringement." *Id.* at 1412.

During the course of trial, the jury heard evidence regarding Mr. Georges' position as the sole person in control of defendant Nephro–Tech's day-to-day operations, including the promotion and sale of the Calphron product. Additionally, evidence was presented indicating that Mr. Georges was not only aware of the existence of plaintiff's patent, but that he continued to promote the sales of Calphron despite his knowledge of plaintiff's belief that such sales infringed the '105 patent. From these facts, the court concludes that it was entirely reasonable for the jury to find Mr. Georges personally liable for infringing the claims of the '105 patent.

Accordingly, and for all of the reasons set forth above, defendants' motion for judgment as a matter of law with respect to G.P. Georges III's individual liability, damages, validity, and infringement is denied.

## 2. Inequitable Conduct

In their papers, defendants argue that plaintiff's actions before the PTO during the reexamination proceedings render the '105 patent unenforceable. Specifically, defendants assert that plaintiff submitted false affidavits in an attempt to deliberately mislead the patent examiner as to the import of the Igusa reference.

The allegedly false affidavits to which the defendants refer were signed by Drs. Fordtran, Emmett, and Cleveland and submitted during the reexamination process. In their respective affidavits, each doctor explains the nature of Dr. Fordtran's invention, expresses an opinion regarding the patentability of the claims set forth by the '105 patent, and explains his view of the scope and content of the relevant prior art. With respect to the Igusa patent application, each doctor describes his view of the experimental methodology utilized. The affiants state that Igusa's test subjects, laboratory rats, were first fed liquid phosphate followed by a dose of calcium carbonate or aluminum hydroxide. Blood and urine samples from the rats were then collected and analyzed.

In their affidavits, each doctor expressed his thoughts regarding why he questioned Igusa's experimental method, as well as his skepticism with respect to Igusa's reported results. First, as noted by all three doctors, the dosage administered to each of the rats was so massive that, if an equivalent dose were to be administered to humans, hypercalcemia would occur, a condition that should be avoided in any event. The affiants further explain that, because Igusa collected and analyzed blood and urine samples rather than assaying the amount of phosphate present in the test subjects' stools, the experiment appeared to be directed toward testing phosphorus levels in the blood as opposed to describing phosphate binding in the gastrointestinal tract. Each affiant points out that, in his opinion, Igusa taught nothing with respect to any calcium-containing compound other than calcium carbonate because only calcium carbonate and aluminum hydroxide were tested. The affiants further state that, although calcium acetate was in fact cited amongst the numerous other calcium-containing compounds listed in the Igusa reference, many of the other calcium compounds listed are toxic to humans, virtually insoluble, or totally ineffective. According to the affiants, it was therefore highly doubtful that, by his experiment, Igusa intended to recommend or otherwise suggest the use of any or all of the other calcium-containing compounds listed in the reference, as many were clearly unsuitable for such a purpose. To the extent that the affiants found Igusa's experimental methodology scientifically suspect, and in light of Igusa's ultimate conclusion that calcium carbonate is a more ideal phosphate binder than aluminum hydroxide, a finding wholly contradictory to established scientific knowledge, the affiants explain that, in their respective opinions, Igusa's experiment lacked credibility and was, therefore, scientifically meritless.

As stated above, it is clear from their affidavits that Drs. Cleveland, Fordtran, and Emmett found the Igusa reference unreliable in both experimental design and the results gathered and reported. Defendants do not challenge the affiants' conclusions regarding the apparent flaws in Igusa's technique nor their opinions with respect to the ultimate untrustworthiness of the Igusa reference. Instead, defendants take issue with the affiants' statements that Igusa was apparently concerned with reducing blood phosphate levels rather than promoting gastrointestinal phosphate binding.

According to the Federal Circuit, "[t]he defense of inequitable conduct in a patent suit, being entirely equitable in nature, is not an issue for a jury to decide." *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed.Cir.1993). Accordingly, evidence regarding this issue was presented to the court during trial, but the jury was not instructed with respect to defendants' inequitable conduct defense. The issue is now ripe for determination by the court.

 Whether a party has engaged in inequitable conduct before the PTO requires the party challenging the enforceability of a patent to establish, by clear and convincing evidence, that the alleged misrepresentation or omission of information was both material and effected with the requisite level of intent. *See, e.g., Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir. 1988). Materiality of the alleged misrepresentation is determined by assessing "whether a reasonable examiner would consider the ... misrepresentation important in deciding whether to issue the patent." *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1481 (Fed. Cir.1986). The requisite level of intent is established if clear and convincing evidence "prove[s] that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, viz., misleading or deceiving the PTO." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed.Cir.1995).

■ Where both the patent in suit and the prior art reference were before the patent examiner, the applicant's attempt to distinguish the prior art does not constitute inequitable conduct because "the examiner [is] free to reach his own conclusion." *Akzo*, 808 F.2d at 1481–82. Nonetheless, that the prior art is independently considered by the .PTO does not alleviate the applicant's duty of candor to the PTO, and, therefore, a deliberate misrepresentation of the prior art's teachings, if sufficiently material, may justify a finding of inequitable conduct. *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 938 (Fed.Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990) ("lapse on the part of an examiner does not exculpate an applicant whose acts are intentionally deceptive").

■ Defendants argue that, by preparing and submitting to the PTO what defendants deem to be materially false affidavits regarding the scope and nature of the Igusa reference, plaintiff's patent is rendered unenforceable for inequitable conduct.[5]

The court concludes that, after a thorough review of defendants' and plaintiff's papers with respect to this issue, as well as the testimony and other evidence presented at trial, defendants have failed to establish, by clear and convincing evidence, that plaintiff's submission of the affidavits amounts to inequitable conduct. Instead, after observing Drs. Cleveland, Fordtran, and Emmett testify at trial, the court concludes that Drs. Cleveland, Fordtran, and Emmett truly believed that Igusa did not disclose the invention set forth in the '105 patent and that they considered the affidavits to be substantially true both at the time that they signed them and at trial.[6] Because of Igusa's controversial methodology and what appear to be scientifically unexplainable results, the court believes that the doctors were justified in their assertions that the Igusa reference did not disclose the use of calcium acetate as a phosphate binder, and that, to the extent that their affidavits reflect that belief, plaintiff's submission of the affidavits does not rise to the level of inequitable conduct.

Each of the doctors testified at trial that the Igusa patent application reported results that were implausible, unreliable, and, in Dr. Emmett's words, "worthless." As noted by Dr. Cleveland, Igusa's conclusion that calcium carbonate bound phosphate more efficiently than aluminum-containing compounds is a result contrary to well-established scientific data, and casts doubt upon the scientific merit of Igusa's experimental results. Additionally, according to Dr. Cleveland, the dosage of phosphate administered to Igusa's experimental rats was potentially lethal, and not, therefore, the most realistic way to test normal phosphate binding, if that was indeed what Igusa was attempting to accomplish. Adding to the doctors' confusion with respect to precisely what Igusa was studying, Igusa was not measuring the amount of phosphate present in stools of each of the experimental rats, an accepted method for assaying gastrointestinal phosphate binding, but was instead testing blood and urine samples.

**5.** The fact that Drs. Cleveland, Fordtran, and Emmett apparently did not themselves prepare the affidavits in question but, instead, merely placed their respective signatures on documents drafted by plaintiff or its agents is somewhat troublesome to the court. The court's concern is heightened by Dr. Emmett's trial testimony that he typed the allegedly false affidavit himself, and his subsequent admission that he did not actually prepare the affidavit, but that it was instead prepared by Braintree and sent to him for his signature. The court does recognize that the words set forth in most affidavits submitted in legal matters are probably prepared by counsel, not the affiant, and that such a practice, although perhaps less than ideal, is not in and of itself fatally defective as long as the affiant is willing to adopt the pre-prepared verbiage and live with the consequences.

**6.** In fact, only Dr. Emmett partially recanted, to the limited extent of the testimony contained in paragraph 24 of his affidavit.

Furthermore, although calcium acetate was admittedly included as part of Igusa's listing of several calcium-containing compounds, each of the doctors explained that they do not interpret Igusa as disclosing calcium acetate's use as a potential phosphate binder for several reasons. First, it appears that calcium acetate was merely cited by Igusa as part of an apparently generic listing of several compounds related only by virtue of the fact that each contained calcium. Additionally, because many of the calcium-containing compounds to which Igusa referred were known to be either ineffective, insoluble, or highly caustic and therefore toxic to humans, Dr. Fordtran explained that he did not believe that Igusa was suggesting anything with respect to whether *any* of the calcium compounds listed could be used for phosphate binding, and was thus certainly not suggesting anything specifically related to calcium acetate. Additionally, as noted by each of the doctors, despite Igusa's reference to several different types of calcium-containing compounds, the only calcium salt actually tested by Igusa was calcium carbonate. The doctors therefore explained that they believed that Igusa's only purpose in executing the experiment was directed toward testing the efficacy of calcium carbonate, not other calcium-containing compounds, as a phosphate binder.

The court is persuaded by these witnesses' testimony that, quite frankly, they were unsure exactly what Igusa was trying to accomplish by his experiment. Indeed, according to Dr. Fordtran, Igusa never explained what he was testing, and that it was entirely unclear from the Igusa reference what method of reaction Igusa believed to be producing the results he was evaluating. Thus, although in retrospect and upon further reflection, these doctors may not now agree with the language set forth in their respective affidavits stating that Igusa concerned the binding of phosphate in the blood, what is clear to the court is that each of the doctors did not understand precisely what Igusa taught and that at the time the affidavits were

presented for their signature, that explanation seemed plausible to them. Nothing in the record supports defendants' contention that Drs. Cleveland, Fordtran, or Emmett, at the time that they signed their affidavits, regarded the information set forth therein as false, and although it certainly would have been better had each of the doctors actually prepared their own affidavits so that they could have provided a more accurate description of what they believed the Igusa reference disclosed, the court nevertheless believes that the fundamental thrust of the affidavits was accurate, i.e., that each of these doctors did not believe that Igusa disclosed the use of calcium acetate as a phosphate binder.

The court also does not believe that Braintree, by preparing the affidavits, acted inequitably. Indeed, the evidence in the record before the court does not convince the court that plaintiff did anything other than attempt to distinguish the Igusa reference from its '105 patent during the reexamination process. Such an attempt to persuade the PTO of the content of an allegedly invalidating prior art reference is not prohibited, and, as stated above, does not alone establish the requisite level of culpability on the part of the patent holder. *See Akzo,* 808 F.2d at 1482. ("Nor does [plaintiff]'s affidavit, advocating a particular interpretation of the [prior art] patents (albeit favorable to [plaintiff]'s position), show any intent to mislead the PTO.") As was the case in *Akzo,* the court concludes that Braintree's "intent was not to mislead, but rather to distinguish prior art" from the '105 patent's claim for the use of calcium acetate as a phosphate binder "and demonstrate to the examiner" that the use of calcium acetate would not have been obvious in light of the Igusa patent application. *Id.*

Finally, the court notes that it does not believe that the alleged misrepresentations regarding the Igusa reference were material. Indeed, because the Igusa reference was placed squarely before the patent ex-

aminer during the reexamination proceedings, the examiner was afforded the opportunity to independently assess the validity of the '105 patent in light of Igusa's teachings. Despite defendants' assertions to the contrary, the evidence before the court does not indicate that the reason the reexamination certificate issued was because the examiner was persuaded by plaintiff's allegedly false characterization of the Igusa reference. The affidavits made numerous compelling points about why Igusa did not teach calcium acetate as a phosphate binder and there is no indication that characterizing Igusa as measuring phosphate binding in the blood stream was even considered by the examiner let alone that it was "important in deciding" whether patentability should be affirmed.[7]

Accordingly, the court concludes that defendants have failed to prove, by clear and convincing evidence, that the affidavits of Drs. Cleveland, Emmett, and Fordtran submitted by plaintiff during the reexamination process contained misrepresentations that were both material and effected with the requisite level of intent. Defendants' motion requesting the court to declare the '105 patent unenforceable on the basis of inequitable conduct is, therefore, denied.

### 3. Defendants' Motion for New Trial

Wholly without elaboration or an explanation as to why defendants believe they are entitled to such relief, defendants alternatively move for a new trial. As set forth above, whether to grant a motion for new trial is discretionary, and is appropriate only in limited circumstances where the court believes the verdict is against the weight of the evidence, where prejudicial error has occurred, or where a miscarriage of justice would result should the verdict be permitted to stand.

The court simply does not believe this is an exceptional case where the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence. On the contrary, the court believes that the verdict is supported by ample evidence, and that it would be inappropriate for the court to disturb the jury's resolution of the conflicting testimony. Accordingly, defendants' motion for a new trial is denied.

### B. Plaintiff's Motion to Alter or Amend the Judgment

Plaintiff moves the court to alter its judgment entered on October 7, 1999 to include an order permanently enjoining defendants from infringing the '105 patent, to include an award of prejudgment interest on the damages awarded by the jury, and for an accounting of the sales made by defendants from September 30, 1999 until the date of the above-requested injunction. Plaintiff further requests an order directing defendants to disgorge any profits re-

7. The court notes that, by arguing that the reexamination certificate affirming the patentability of the '105 patent issued only because the patent examiner in this case was persuaded by Drs. Cleveland, Fordtran, and Emmett's characterization of the Igusa experiment as assaying blood phosphate binding as opposed to gastrointestinal binding, defendants have failed to consider the correct legal standard regarding materiality. Indeed, because the inequitable conduct's materiality inquiry is predicated not on whether the examiner involved in a particular case actually found the alleged omission or misrepresentation important in deciding the validity of a patent, but instead on whether a *reasonable* patent examiner would find such information important in deciding the patentability issue, defendants' arguments regarding what the ex-

aminer in this case found important are beside the point. The record is wholly devoid of any evidence indicating what a reasonable examiner would deem important. The court is left only with defendants' assertions with respect to the examiner involved in the '105 patent's reexamination proceedings. Based on the evidence in the trial record, the court believes that not only have the defendants failed to prove that the particular examiner involved in this case found the affiants' representations that Igusa was concerned with phosphate binding in the blood as opposed to gastrointestinal binding important in deciding to affirm the claims of the '105 patent, but also, and more importantly, they have failed to prove that a reasonable examiner would find such representations material in light of the totality of the evidence.

vealed by the requested accounting in a manner at least corresponding to the percentage of damages awarded by the jury to plaintiff. The court considers each argument in turn.

### 1. Plaintiff's Request for an Injunction

 Plaintiff moves the court to enter an injunction in its favor to protect its rights under the '105 patent. In response to plaintiff's motion, defendants request the court to modify certain portions of plaintiff's proposed injunction language. The court's power to grant injunctive relief to a prevailing patent owner is provided under 35 U.S.C. § 283:

The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

35 U.S.C. § 283. According to the Federal Circuit, "[i]t is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it." *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1247 (Fed.Cir. 1989).

 After a careful review of the facts in this case and the law governing the propriety of injunctive relief, the court is persuaded that no sound reason exists to deny plaintiff's motion for an injunction. As set forth in full below, to the extent that the plaintiff, in its reply brief, has offered to make various alterations to the language of its proposed injunction in order to comply with defendants' objections thereto, the court adopts the concessions in full because it believes that they adequately address the corresponding concerns raised by defendants in their response to plaintiff's proposed injunction. The court also finds it appropriate to adopt defendants' suggestion to alter its product's label to include language stating that defendant's product is not to be taken with meals so as to decrease the risk that the product will be used as a phosphate binder. Because the court believes that, as detailed in full below, the injunction entered by the court is sufficient to protect plaintiff's interests in the '105 patent, the court declines to adopt plaintiff's proposal that defendants should be ordered to alter the amount of calcium acetate per tablet.

The court turns next to the defendants' more substantive objections to plaintiff's proposed injunction. Defendants object to the proposed injunction's requirement that written notice of the injunction be sent "to all of [defendants'] present and past customers, distributors, and end users and all agencies or entities making payment for reimbursement of any purchase, of the product Calphron." Although plaintiff argues that nothing in the patent limits plaintiff's method-of-use patent of phosphate binding to end-stage renal disease patients, plaintiff does not object to replacing the term "end users" with the phrase "wholesalers, warehousers, dialysis clinics, doctors, and other providers in the nephrology community." Because the court deems ordering defendants to so provide a copy of the injunction to defendants' customers necessary to protect plaintiff's rights in the '105 patent, the court adopts plaintiff's suggestion with respect to the modification of the term "end users." The court further finds persuasive plaintiff's argument that notice of the injunction as set forth below should be forwarded to government agencies in the event that such agencies responsible for the reimbursement and/or approval of products such as Phos–Lo and Calphron have been led to believe by defendants that Calphron may be substituted for Phos–Lo and thus may be used as a phosphate binder. Whether such agencies do not specifically approve products for a particular use is inapposite to this inquiry; instead, the court finds it notable that the two products have been compared, on at least one occasion, to one another in a letter to a state medicaid agency, and thus that any confusion between the products might be allevi-

ated if notice of the injunction is sent to all such similar agencies with which defendants correspond. Indeed, because defendants contend that their product is marketed and sold as a calcium supplement only, and because defendants contend that such agencies approve *products,* not *uses* of products, defendants should not be prejudiced as a result of sending notice of the injunction to such government agencies. Defendants' argument with respect to this issue is, therefore, rejected.

 With respect to plaintiff's request for the court to order defendants to change the name of its product, the court agrees that, under the facts and circumstances of the case, such relief is appropriate. The court is persuaded that defendants' product has been identified as one to be used as a phosphate binder, and thus that requiring defendants to change the name of its product and to adopt a name less suggestive of its potential use as a phosphate binder is appropriate.[8] Indeed, for those in the medical community who have come to identify defendants' product as suitable for use as a phosphate binder in ESRD patients, the requested injunction is required to help prevent further infringement of the '105 patent by medical personnel unfamiliar with the results of this litigation. Thus, because health care providers accustomed to using defendants' product as a phosphate binder will not be deterred from using the product despite the outcome of this litigation because the product has been identified, at least by some, with such a use in the past, the court concludes that plaintiff's request is necessary to prevent further violations under the facts of this case.

**8.** The court further notes that it may be more than a mere coincidence that professionals within the nephrology community may identify, or have been somehow encouraged to believe, that defendants' product is designed for use as a phosphate binder. At trial, Dr. Cleveland testified that the name "Calphron" appeared to be a combination of the words "calcium" and "nephron," the name of the cells of which the kidney is comprised and

Moreover, because defendants steadfastly maintain that, at all times, their product has always been promoted as a calcium supplement, rather than as a phosphate binder, the court does not believe that requiring defendants to alter the product's name in an effort to counteract any name-recognition effect that may persist despite plaintiff's victory in this litigation would unfairly prejudice the defendants in this case. In fact, a name change to a term that will more precisely reflect defendants' product's specified non-infringing use, i.e., as a calcium supplement, might help to stimulate sales to those interested in utilizing the product for calcium supplementation. Accordingly, the court grants plaintiff's request that the injunction include language prohibiting the sale of defendants' product under the brand name Calphron.

For the reasons set forth above, plaintiff's motion for injunction against defendants Nephro-tech and G.P. Georges III is hereby granted under the terms set out in full at the conclusion of this order.

## 2. Prejudgment Interest

Additionally, plaintiff moves for an award of prejudgment interest. Under 35 U.S.C. § 284, a patent owner is entitled to damages which will adequately compensate him for the infringement, "together with interest and costs as fixed by the court." 35 U.S.C. § 284.

 In *General Motors v. Devex,* 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), the Supreme Court held that, as a general rule, "prejudgment interest should ordinarily be awarded" in patent cases. *Id.* at 655, 103 S.Ct. 2058. Such an

which perform the kidney's filtering function. Dr. Cleveland further testified that the symbol on defendants' product appeared to represent a pair of healthy kidneys. Taken together, it is quite possible that the name of defendants' product and the symbol on the product's label are highly suggestive of the product's potential use as a phosphate binder, and thus that, for this additional reason, a brand name change is in order under the facts of this case.

award is usually necessary, the Supreme Court explained, "to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *Id.* Upon a finding of infringement, the district court is afforded substantial discretion in determining the amount of prejudgment interest to be awarded. *See, e.g., Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 939 F.2d 1540, 1545 (Fed.Cir.1991); *Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 556–57 (Fed.Cir.1984).

Defendants argue that plaintiff is not entitled to prejudgment interest accruing during the period in which this action was stayed pending reexamination of the '105 patent by the PTO. With respect to this issue, the court first notes that an award of prejudgment interest, although ordinarily awarded, is not mandatory, and that, in some instances, "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Devex,* 461 U.S. at 657, 103 S.Ct. 2058. In this case, however, the court does not believe that plaintiff has, by any of its actions, effected any type of undue delay in pursuing its rights under the patent, nor is there any indication that defendants were somehow prejudiced by the stay of the litigation during the reexamination proceedings. Indeed, the reexamination proceedings were initiated by defendants, and it was defendants who moved to stay this action pending the outcome of the reexamination process, a motion plaintiff vigorously opposed. Thus, any delay resulting from the PTO's reexamination procedure was not the product of any action pursued by plaintiff. The court therefore concludes that plaintiff is entitled to prejudgment interest accruing during the reexamination proceedings.

Additionally, defendants take issue with the manner in which plaintiff's expert calculates the prejudgment interest to which plaintiff believes it is entitled. More specifically, defendants appear to argue that any award of prejudgment interest must be calculated with reference to what a reasonable. royalty would have been had the plaintiff and defendants entered a licensing agreement with regard to the '105 patent, rather than with respect to the amount of lost profits awarded. Defendants do not, however, refer the court to any legal authority to support such an assertion, and it is clear that prejudgment interest is properly awardable on lost profits awards as well on reasonable royalty awards. *See, e.g., Oiness v. Walgreen Co.,* 88 F.3d 1025, 1033 (Fed.Cir.1996) (reversing trial court's award of prejudgment interest on future lost profits damages, but noting that "[u]pon remand, the trial court may award interest on the $220,567 award of lost profits supported by the record evidence"); *Lummus Indus. Inc. v. D.M. & E Corp.,* 862 F.2d 267, 274 (Fed.Cir. 1988) ("Prejudgment interest is not limited to damages measured by a royalty.") Defendants' challenge to plaintiff's request for prejudgment interest on this basis, is, therefore, denied.

Defendants do not appear to challenge the rate at which plaintiff seeks to recover prejudgment interest, and the court therefore adopts the plaintiff's suggested rate of 5.825% per annum. In addition to their previously rejected argument regarding the propriety of awarding interest with reference to lost profits as opposed to a reasonable royalty, defendants' only other objection to plaintiff's motion for prejudgment interest appears to be that, in their view, the interest should not be compounded during the time that the case was stayed pending patent reexamination. As with the determination of the rate at which prejudgment interest is to be awarded, "the determination whether to award simple or compound interest similarly is a matter largely within the discretion of the district court." *Gyromat,* 735 F.2d at 557. As set forth above, the court rejects defendants' arguments with respect to whether

prejudgment interest should be awarded for the time during which the action was stayed. Defendants fail to provide, and the court is unable to find, any reason why the award of prejudgment interest should not be compounded in this case. Moreover, the manner in which plaintiff's expert, Dr. Gregory K. Bell, has calculated the amount of prejudgment interest plaintiff requests appears reasonable to the court, and defendants have failed to provide any authority to the contrary. Accordingly, plaintiff is entitled to prejudgment interest on its lost profits award of $300,000 in the amount of $27,165.

### 3. Entitlement to an Accounting

Plaintiff moves the court to order an accounting of the sales made by defendants of their Calphron product from September 30, 1999 (the date through which damages were calculated by plaintiff's expert and considered by the jury) and the date on which the proposed injunction is entered by this court. Following such an accounting, plaintiff claims that it is entitled to an order from this court directing defendants to disgorge the amount of profits on the basis of the percentage of damages awarded by the jury to plaintiff.

 Plaintiff's request for such relief was neither set forth in its complaint nor preserved in the pre-trial order. The court considers a request for an accounting to be a significant claim for relief and not a mere clerical exercise which would routinely and readily follow from a verdict in plaintiff's favor. Failure to so preserve the request for an accounting acts as a waiver and closes the door on further inquiry. *See Hullman v. Board of Trustees of Pratt Comm. College,* 950 F.2d 665, 667 (10th Cir.1991) ("The pretrial order supersedes the pleadings and controls the subsequent course of litigation"); Fed. R.Civ.P. 16(e); D.Kan.Rule 16.2.

 Even a cursory look at the substance of the request demonstrates why the court should deny relief here. This case is unlike the situation in which the fact-finder has awarded damages based on a reasonable royalty. If the damages awarded were based on a reasonable royalty in this case, the court could, after an accounting, simply reference the reasonable royalty percentage decided upon by the jury and apply that to any sales revealed by the accounting. Here, however, it would be wholly speculative for the court to attempt to award damages based on the outcome of the requested accounting because it would be unclear just how much of the profits had been generated from infringing sales. Moreover, it is not just a matter of extrapolating damages from the jury's lost profits award because we do not know how the jury arrived at the $300,000 damages figure, and simplistically multiplying by the ratio to which the amount of the jury's award bears to plaintiff's demand would be arbitrary and speculative. Thus, it would be impossible for the court to determine whether any further damages awarded in light of the requested accounting would accurately correspond to the damages awarded by the jury in this case without establishing a detailed process to facilitate the inquiry, and it is too late to raise such a request for the first time at this juncture.[9]

**IT IS THEREFORE BY THE COURT ORDERED THAT** defendants' motion for judgment as a matter of law, or, alternatively, for new trial (doc. 145) is DENIED. Specifically, defendants' motion for judgment as a matter of law with respect to the issues of damages, G.P. Georges III's individual liability, infringement, and validity is denied. Defendants' request that the court hold plaintiff's patent unenforceable on the ground of inequitable conduct is denied. Defendants' motion for new trial is denied.

---

9. The court denies plaintiff's request for a hearing on this issue. Indeed, because plaintiff has wholly failed to establish in its papers why the requested relief is appropriate, a hearing with respect to this request would not aid the court in ruling.

**IT IS FURTHER ORDERED THAT** plaintiff's motion to alter or amend the judgment (doc. 147) is granted in part and denied in part. Specifically, plaintiff's motion for prejudgment interest in the amount of $27,165 is GRANTED. Plaintiff's motion for an injunction is GRANTED to the extent set forth below. Plaintiff's motion for an accounting is DENIED.

**IT IS FURTHER ORDERED THAT** a permanent injunction issue directed to the defendants, Nephro–Tech, Inc., and G.P. Georges III, their privies, assignees, officers, agents, attorneys, employees, representatives and associates, and all those in active concert or participation with them who receive actual notice of said injunction, by personal service or otherwise, enjoining and restraining them collectively, and individually,

(1) from infringing U.S. Letters Patent No. 4,870,105, by directly or indirectly selling, causing to be sold, or promoting their calcium-acetate product Calphron, or any other product whose active ingredient is calcium-acetate, however named or labeled, as a phosphate binder;

(2) from inducing others to practice the method described and claimed by said patent, or contributing to the infringement of said method by others, including, but not limited to, selling or causing to be sold or promoting in any manner, any product whose active ingredient is calcium acetate, however labeled or named, for use as a phosphate binder, in accordance with said patent, including advertising and promoting any such product to dialysis clinics, in journals, and at trade shows, directed to nephrologists, renal dieticians, renal nurses or others treating or caring for patients with kidney disease ("nephrology community");

(3) from selling or causing to be sold or promoting, in any manner, any product for use as a phosphate binder in accordance with the method claimed in said patent whose active ingredient is calcium acetate, however labeled or named, to said nephrology community or any health care provider providing treatment or care to patients with kidney disease.

**IT IS FURTHER ORDERED THAT** the defendants, Nephro–Tech, Inc., and G.P. Georges III, send written notice of this injunction, by a copy thereof, to all of their present and past customers, distributors, wholesalers, warehousers, dialysis clinics, doctors, and other health care providers in the nephrology community, and all agencies or entities making payment for reimbursement for any purchase, of the product Calphron.

**IT IS FURTHER ORDERED THAT** should the defendants, Nephro–Tech, Inc. and/or G.P. Georges III, wish to sell, cause to be sold, or promote calcium acetate for any use other than as a phosphate binder outside of the nephrology community, the product shall contain a conspicuous labeling that it is not to be taken with meals and that it is not intended to be used as a phosphate binder, and the name of the product shall not be Calphron.